IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IN RE | ) Chapter 13 |
| | ) |
| Tayler Stewart, | ) No 22-B-09727 |
| | ) |
| Debtor | ) Judge A. Benjamin Goldgar |
| | |
| Tayler Stewart, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| -vs- | ) Adversary No. 22 A |
| | ) |
| Joseph Giordano, | ) |
| | ) |
| Defendant. | ) |

**ADVERSARY COMPLAINT TO DETERMINE VALUE OF THE PROOF OF CLAIM FILED BY JOSEPH GIORDANO, SEEKING INJUNCTIVE RELIEF AND DAMAGES FOR VIOLATION OF THE AUTOMATIC STAY**

NOW COMES, Plaintiff, Tayler Stewart (hereinafter called "Ms. Stewart") by and through her attorneys Penelope N. Bach and Paul M. Bach of Bach Law Offices, Inc. and pursuant to Federal Rule of Bankruptcy Procedure 7001 et seq. and complaining of the Defendant, Joseph Giordano, (hereinafter called "Mr. Giordano") states as follows:

**JURISDICTION AND VENUE**

1. This is an adversary proceeding brought pursuant Rule 7001 of the Federal Rules of Bankruptcy Procedure. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334 and 11 U.S.C. §§ 105, 362 and 523.

2. This adversary proceeding is a core proceeding as defined by 28 U.S.C. § 157. In the event that any of the relief sought by the Plaintiff in this case is determined to be non-

1

core the Plaintiff consents to the entry of final orders or judgment by the Bankruptcy Judge assigned to this case.

3. Venue is proper under 29 U.S.C. § 1409.

## PARTIES

4. Plaintiff, Ms. Stewart, is an individual and is the debtor in the underlying Chapter 13 Bankruptcy Case number 22 B 09727 filed in the Northern District of Illinois, Eastern Division, on August 26, 2022.

5. Defendant, Mr. Giordano, is an individual who has filed proof of claim 8-1 (*a copy of proof of claim 8-1 is attached as an exhibit*), alleging $5,000,000.00 due related to pending state court action, pending in the Marion County Superior Court - Civil Division in the State of Indiana No. 46D06-1912-CT-053399 (the "State Litigation") filed on August 20, 2021.

## FACTS COMMON TO EACH COUNT

6. Ms. Stewart and Mr. Giordano met via Bumble (an online dating application) prior to meeting in person and they exchanged information.

7. On September 27, 2019, Giordano invited Stewart out to dinner at True Food Kitchen in Chicago, Illinois. Both parties consumed food and alcohol.

8. After dinner, they went to the Berkshire Room, where both parties consumed alcohol.

9. While at the Berkshire Room, Ms. Stewart and Mr. Giordano engaged in conversation.

10. Ms. Stewart asked why he was still single at 48 years of age as Ms. Stewart, at the time, was 30 years old.

11. His response was that he has issues with "women who have a body part that he doesn't like" as he wanted to have children and didn't want the children to suffer from bullying.

12. When Ms. Stewart asked for more information, he stated that he was bullied as a child and sought professional help for it. When Ms. Stewart apologized, Mr. Giordano became angry.

13. They eventually left the Berkshire Room and went to another social establishment via Uber.

14. Mr. Giordano had a couple more drinks that night and Ms. Stewart had one more.

15. While there, Mr. Giordano started to kiss Ms. Stewart and push himself onto her.

16. Mr. Giordano then invited Ms. Stewart to his hotel, the Ritz Carlton.

17. Ms. Stewart wanted to decline, but Mr. Giordano insisted that she needed to see the newly renovated hotel.

18. While there, Mr. Giordano showed Ms. Stewart the bar and lobby, and he asked her to see his room as it was a large suite.

19. When they arrived at his room, he showed her around and asked if she wanted anything else to drink. He grabbed a beer and she asked for water.

20. They sat on the couch and Mr. Giordano started to kiss Ms. Stewart. Ms. Stewart asked him to stop, but he did not. Instead, he got on top of her. Ms. Stewart attempted to push him off of her, but he was stronger than her. He then put his hand under her dress and felt her breasts. Again, she told him to get off of her. After the second request, he apologized but did not release her.

21. He then asked if she wanted to listen to music, and she agreed. After listening to a few songs, Ms. Stewart stated that she needed to leave. Mr. Giordano told her that he would order her an Uber after he went to the bathroom. When he came out of the bathroom, he had his pants unzipped and on his hips. While he still had his boxers on, his penis was erect. He then sat next to her and started aggressively kissing her. He then got on top of her with one arm behind her neck; he put his other hand under her dress again and inserted his fingers inside her vagina. Ms. Stewart kept calling his name and attempted to push him away from her but he refused to listen.

22. He continued to penetrate her vagina with his fingers. Ms. Stewart again called his name and asked him to "get up" but he refused.  Instead, he pushed harder against her and then penetrated her vagina with his penis. After he finished penetrating her, he lifted himself up, laughed and put his head on her shoulder.

23. Ms. Stewart then said that she needed to leave. Mr. Giordano ordered her an Uber.

24. He then asked her to stay the night and promised that he wouldn't "try anything else" but she declined.

25. As she was leaving, Mr. Giordano pinned her against the wall by the door and started to kiss her again against her will.

26. He also put his hand up her dress again to fondle her breasts.  When he tried to penetrate her vagina with his fingers for the second time, the text from Uber stopped him from doing so.

27. He then stated that he wanted to see her again as he walked her to the elevator.

28. Ms. Stewart acted as if everything was okay as she just wanted to get home safely.

29. She then texted him that she "had the best time"—a message that she has texted to other people that she has dated.

30. When she got home, Ms. Stewart went to bed.

31. When she woke up, she was tired, sore, hazy, and confused.

32. On September 29, Ms. Stewart texted Mr. Giordano to ask what beer he drank that night as she has a gluten allergy and feared that she was having a reaction to it. She further told him that she felt "pretty sick" and that she was "clearly out of it."

33. Mr. Giordano and Ms. Stewart continued to text each other, and Ms. Stewart stated that she liked him.

34. However, as Ms. Stewart began to process the rape, she became angry, embarrassed, felt manipulated, taken advantage of and afraid.

35. Ms. Stewart then obtained a few anonymous numbers from an app on her phone in an attempt to confront him as she did not want to send the text from her own number. She further pretended to be other people in order to appear as though she had support, as Mr. Giordano threatened Ms. Stewart that he would have the attorney general and/or the FBI prosecute her.

36. Ms. Stewart also obtained another anonymous number, under the alias of "Rachel" to protect her identity, and texted his sister-in-law to warn her of his behavior as she knew that Mr. Giordano was taking her son (his nephew) on a tour of the US after his graduation.

37. On October 9, 2019, Ms. Stewart received a call from a blocked number, which eventually turned out to be a private investigator (PI) hired by Mr. Giordano.

38. On this first call, the PI pretended to be a woman who was a friend of a woman that recently went on a date with Mr. Giordano had also "allegedly" been assaulted by him. It appeared that she was trying to get Ms. Stewart to talk about her experience with him on their date.

39. Ms. Stewart thought this was a strange conversation and did not trust her, so she did not admit to being assaulted, but only stated that Mr. Giordano was very aggressive with her.

40. On October 17, 2019, the PI again called Ms. Stewart and indicated that her name was Crystal Jones of Lauth Investigations and that she was hired to investigate her as Mr. Giordano stated that he was being extorted.

41. Ms. Stewart told her that Mr. Giordano had raped her.

42. The PI then told her that she needed to be careful, as Mr. Giordano hired her to send spyware to her personal phone and to track all of her movements.

43. The PI also told Ms. Stewart that Mr. Giordano has friends and family in law enforcement and asked them to contact Ms. Stewart in an attempt to intimidate her.

44. The PI additionally indicated that she did not believe Mr. Giordano's side of the story.

45. The PI lastly told her Mr. Giordano would likely initiate a lawsuit against her.

46. During this time, Ms. Stewart called to make a police report; however, the officer that she spoke to indicated that it would be a hard case to prosecute as date rapes can be complicated and she did not immediately report it or get a rape kit completed.

47. Over the next couple of days, the sister-in-law continued to communicate with Ms. Stewart and told her to file a police report as he would try to destroy her life and would not stop.

48. Ms. Stewart was in fear of her safety and remains in fear due to his behavior.

49. On August 20, 2021, Mr. Giordano filed suit against Ms. Stewart in the Marion County, Indiana, Superior Court under Cause No. 46D06-1912-CT-053399.

50. The State Court Litigation alleged five counts: Defamation, Stalking, Intimidation, Harassment and Tortious Interference with Business Relationships.

51. Ms. Stewart filed a counter-claim in the State Court Litigation which alleged three counts: Battery, Intentional Infliction of Emotional Distress and Negligent Infliction of Emotional Distress.

52. To date, Mr. Giordano has been unable to provide any basis for monetary damages in the State Court Litigation.

53. Due to the extreme costs of litigation, Ms. Stewart had no choice other than to seek relief under the Bankruptcy code.

54. Since the filing of the Bankruptcy Code, Mr. Giordano has taken the following steps to punish the Debtor file filing her Chapter 13 and coerce the Debtor into paying exorbitant amounts of money to him:

   a. Letters mailed to Ms. Stewart's spouse;

   b. Letters mailed to Ms. Stewart's parents;

   c. Letters mailed to Ms. Stewart's church;

   d. Letters to Ms. Stewarts mother at her place of her employment;

   e. Letters to Ms. Stewarts spouse at the place of his employment;

    f.   Frequent, and at one point daily, telephonic and email communications to the Ms. Stewart's employer;

    g.   Upon information and belief, was seen watching the Ms. Stewart's residence;

    h.   dvising Ms. Stewart that she brought this upon herself for not agreeing to pay $10,000,000 to him in damages; and

    i.   Sending ranting and threatening communications to Saeed and Little, Ms. Stewart's Indiana Counsel.

    *See Attached Group Exhibit B

55. Ms. Stewart is scared for her safety and the safety of her family, co-workers and members of her community.

## COUNT I – OBJECTION TO PROOF OF CLAIM 8-1

56. Plaintiff restates and realleges paragraphs 1 through 55 as though fully set forth herein.

57. On or about October 31, 2022, Mr. Giordano filed a proof of claim in the total amount of $5,000,000.00. See attached Exhibit is a true and accurate copy of the Proof of Claim ("Claim 8-1") filed by Mr. Giordano.

58. Claim 8-1 states that the total amount of $5,000,000.00 is general unsecured debt based upon damages for defamation, harassment intimidation etc. and attaches thirty-four pages of exhibits to allegedly support Claim 8-1.

59. Mr. Giordano attaches an unsupported dialogue that he alleges explains why he is owed such an extreme amount. In the attachments, he includes a five page hearsay document; a copy of his State Court Complaint, without the answer or counter-Claim; a copy of a no-stalking order; a copy of a transcript of the stalking proceedings, which

8

states that no attorney fees will be awarded, (*See Mr. Giordano's POC EX Page 30 lines 12-15).* Nothing in any of these attachments evidence any damages, no breakdown of how damages were calculated or that at any point there was actual damages caused by Ms. Stewart.

60. Through the State Court Litigation, Ms. Stewart has sought any evidence of damages in Order to resolve the matter fairly, to date no such evidence has been provided.

61. As Mr. Giordano cannot support any rationale for damages from Ms. Stewart, Claim Number 8-1 should be modified by this Court to a claim of $0.00.

## STANDARD

62. A proof of claim executed and filed in accordance with Rule 3001 shall constitute prima facie evidence of the validity and amount of the claim. Rule 3001(f).

63. "Claim objectors carry the initial burden to produce some evidence to overcome the rebuttable presumption of validity." In re Dugar, 392 B.R. 745, 749 (Bankr.N.D.Ill 2008).

64. "Once the objector has produced some basis for calling into question allowability of a claim, the burden then shifts back to the claimant to produce evidence to meet the objection and establish that the claim in fact is allowable." In re Vanhook¸ 426 B.R. 296, 299 (Bank.N.D. Ill. 2010).

65. "However, the ultimate burden of persuasion always remains with the claimant to prove entitlement to the claim." In re Watson, 402 B.R. 294, 297 (Bankr.N.D.Ind. 2009).

WHEREFORE, the Debtor, Tayler Stewart, asks this Honorable Court for the following relief:

    a. Sustaining Debtor's Objection to Claim 8-1;

    b. Modifying Claim 8-1 to a claim of $0.00;

    c. For any and all other relief this Court deems fair and proper.

## COUNT II – INJUNCTIVE RELIEF

66. Plaintiff restates and realleges paragraphs 1 through 55 as though fully set forth herein.

67. Through his conduct in contacting Ms. Stewarts employer, co-workers, family and church, Mr. Giordano will cause irreparable harm to Ms. Stewart by:

    a. Putting her employment in jeopardy;

    b. Making church an unsafe place to be; and

    c. Putting herself and family at risk of additional assault and potential battery.

Wherefore, Tayler Stewart prays for an order of this Court restraining Mr. Giordano from contacting anyone outside his Counsel in relation to Ms. Stewart and for any other relief this Court deems just.

## COUNT III – SANCTIONS FOR VIOLATIONS OF THE AUTOMATIC STAY

68. Plaintiff restates and realleges paragraphs 1 through 67 as though fully set forth herein.

69. Pursuant to 11 U.S.C. §362, the filing of the Bankruptcy Case invoked the protections of the automatic stay prohibiting any acts to collect upon the subject debt by Mr. Giordano or any other party or defendant.

70. At no time has Mr. Giordano moved for relief from the automatic stay.

71. While the Bankruptcy was pending and the automatic stay was in full force and effect. However, Mr. Giordano sought to collect the subject debt from Ms. Stewart.

72. All of Mr. Giordano's collection efforts occurred with actual knowledge of Ms. Stewart's bankruptcy filing. *See Attached Exhibit B, a true and Correct copy of a Cease and Desist letter sent by Saeed and Little, and Exhibit C, a true and correct copy of the BNC's certificate of the Notice of Meeting of Creditors and Exhibit D, certificate of service of Ms. Stewart's Chapter 13 Plan.*

73. Concerned about the violations of her rights and protections afforded by virtue of filing her Chapter 13 case, Ms. Stewart sought the assistance of counsel to ensure Mr. Gioardano's collection efforts ceased.

74. Ms. Stewart has expended time and incurred costs consulting with her attorneys as a result of Mr. Giordano's deceptive collection actions.

75. Ms. Stewart was unduly inconvenienced and harassed by Mr. Giordano's unlawful attempts to collect the subject debt.

76. Mr. Giordano's collection efforts were highly upsetting to Ms. Stewart as she was led to believe the bankruptcy had no legal effect and that she was still obligated to continue defending the State Court Litigation; which was the driving force in her decision to seek bankruptcy protection.

    a. Section 11 U.S.C. §362(a)(6)

77. The principal purpose of the Bankruptcy Code is to grant a 'fresh start' to the 'honest but unfortunate debtor." *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 367, 127 S.Ct. 1105, 1107, 166 L.Ed.2d 956 (2007).

78. Section 362(a)(6), commonly known as the automatic stay provision, prohibits "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title." 11 U.S.C. §362(a)(6).

79. "The automatic stay invoked by the filing of a bankruptcy petition protects a debtor from creditors' attempts to collect pre-petition debts. The automatic stay is designed to give Debtor breathing space so that they may reorder their affairs." *In re Robinson*, 228 B.R. 75, 80. (Bankr.E.D.N.Y.1998).

80. "As one of the fundamental debtor protections provided by bankruptcy laws, the automatic stay is intended to stop virtually all debt collection efforts, including efforts to take possession of collateral." *In re Bishop*, 296 B.R. 890, 894 (Bankr.S.D.Ga.2003).

    b.    Mr Giordano's violations of the Automatic Stay

81. Despite having actual notice of Ms. Stewart's bankruptcy, Mr. Giordano continued to contact Ms. Stewart's family, friends, co-workers, employers and church.

82. The communications of Mr. Giordano were direct violations of the bankruptcy automatic stay.

    c. Mr. Giordano's conduct was perpetual, willful, and wanton

83. Despite having actual knowledge of Plaintiff's Bankruptcy, Mr. Giordano committed an egregious violation of the automatic stay by his continued harassment of Ms. Stewart. This action is especially egregious as Mr. Giordano's actions after participating in the Chapter 13 shows a lack of respect for the Bankruptcy.

84. The conduct of Mr. Giordano warrants sanctions and punitive damages to deter future conduct of a similar nature.

85. Ms. Stewart is entitled to actual damages, attorney's fees, and costs for Mr. Giordano's willful violations of the automatic stay injunction. Ms. Stewart is also entitled to punitive damages for Mr. Giordano's arrogant defiance of the Bankruptcy Code and its provisions. The Court should award punitive damages to deter Mr. Giordano from future misconduct.

WHEREFORE, Plaintiff Ms. Stewart request that this Honorable Court:

a. Enter an order directing Mr. Giordano to pay a sum determined by the Court to Ms. Stewart for actual damages for violations of 11 U.S.C. §362(k)(1);

b. That this Honorable Court enter an order directing Mr. Giordano to pay a sum determined by the Court to Ms. Stewart for punitive damages for violations of 11 U.S.C. § 362(k)(1);

c. That this Honorable Court enter an order directing Mr. Giordano to pay a sum determined by the Court to Ms. Stewart for all reasonable legal fees and expenses incurred by his attorneys for violations of 11 U.S.C. §362(k)(1); and

d. That Ms. Stewart be provided such other and further relief as the Court may deem just and proper.

    Respectfully submitted,

    Tayler Stewart

    By: /s/ Paul M. Bach
    One of his attorneys

Paul M. Bach
BACH LAW OFFICES
P.O. Box 1285
Northbrook, Illinois 60065

(847) 564 0808